UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

BRENT JACOBY,

                                       Plaintiff,

      vs.

                                   9:07-CV-872

D. PHELIX, Captain, Franklin Correctional     (DNH/ATB)
Facility; R. GATES, Sergeant, Franklin
Correctional Facility; E. COUPAL, Correctional
Officer, Franklin Correctional Facility,[1]

                                      Defendants.

_____

BRENT JACOBY, Plaintiff Pro Se
ADRIENNE J. KERWIN, Asst. Attorney General for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

    This matter was referred by United States District Judge David N. Hurd for

Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rules

N.D.N.Y. 72.3(c).  The case was transferred to me on January 4, 2010, following the

retirement of U.S. Magistrate Judge Gustave J. Di Bianco.  (Dkt. No. 46).

    While an inmate in the custody of the Department of Correctional Services

("DOCS") at Clinton Correctional Facility, plaintiff filed his complaint, pursuant to 42

U.S.C. § 1983, regarding events that occurred during his incarceration at Franklin

---

[1] Plaintiff's original complaint included L. Sears, D. Artus, and D. Selsky as defendants.
Pursuant to the order entered by Judge Hurd on August 19, 2008, (Dkt. No. 23) the complaint
was dismissed without prejudice as to defendants Sears, Artus, and Selsky.

Correctional Facility ("Franklin").  Plaintiff's complaint lists three causes of action.

He alleges that defendants Coupal and Phelix retaliated against plaintiff for filing

grievances ("Count 1").  (Compl. at 19).[2]  He claims that defendant Coupal violated

plaintiff's Eighth Amendment right to be free from cruel and unusual punishment

("Count 2").  (*Id*.).  Finally, plaintiff alleges that defendants Phelix and Gates violated

his Fourteenth Amendment right to due process ("Count 3").  (Compl. at 19–20).

Plaintiff seeks monetary damages.  (Compl. at 20).

Presently before this court is defendants' motion for summary judgment

pursuant to Fed. R. Civ. P. 56. (Dkt. No. 37).  Plaintiff has responded in opposition to

the motion. (Dkt. No. 45).  For the following reasons, this court recommends that

defendants' motion be granted in part and denied in part.

## DISCUSSION

I.  **Facts**

On September 30, 2006, plaintiff was issued a misbehavior report for

"cheeking" pills.  (Defs.' Ex. B).  A Tier III[3] hearing was held on October 4, 2006, and

---

[2] Plaintiff's complaint is confusingly numbered, with the first six pages, which appear to be a form, numbered 3–8 and the next fourteen pages numbered 1–14.  Plaintiff has numbered some of the paragraphs, but not all of them.  Consequently, for the sake of clarity, the court will cite to information in the complaint by page number, beginning with the first page of the complaint as page 1 and continuing through page 20.

[3] New York prison inmates are subject to three levels of disciplinary hearings for violations of prison rules.  *Porter v. Coughlin*, 421 F.3d 141, 142 n.1 (2d Cir. 2005) (citing *inter alia* N.Y. COMP. CODES R. & REGS. tit. 7 §§ 270.2 (Standards of Inmate Behavior), 270.3 (Tiers of Disciplinary Hearings), 252.5 (Tier I dispositions), 253.7 (Tier II dispositions), and 254.7 (Tier

plaintiff was found guilty of creating a disturbance, smuggling, interference with an employee, and refusing a direct order.  (Defs.' Ex. C).  Plaintiff was sentenced to one month in the Special Housing Unit ("SHU"), which time began on October 4, 2006. (*Id*.).  Plaintiff had his first interaction with defendant Coupal, a corrections officer in the Alcohol and Substance Abuse Treatment ("ASAT") dorm, on October 3, 2006—the day before his Tier III hearing.  (Compl. p. 1, Pl.'s Dep. at 22, 27).  At his deposition[4] in this case, plaintiff testified that he had arrived in the ASAT dorm about four days before his encounter with defendant Coupal. (Pl.'s Dep. at 22).  This statement is consistent with the location indicated on the misbehavior report dated September 30, 2006.  (Defs.' Ex. B).

Plaintiff alleges that, when he first arrived at the ASAT dorm, he put up a "collage," consisting of girls' pictures.  (Pl.'s Dep. at 27; Pl.'s Resp. Ex. 1, at 60[5]). Some of the other inmates in the ASAT dorm told plaintiff that he would be told to take down the pictures and that defendant Coupal "would flip out as soon as he came in."  (Pl.'s Dep. at 28).  Plaintiff wrote a grievance about the picture policy on October

---

III dispositions)).  Tier III hearings are reserved for the more serious violations.

[4] Plaintiff was deposed on February 9, 2009, and the transcript of the deposition has been filed as Defendants' Ex. A.

[5] Plaintiff filed 66 pages of documents as an "exhibit" to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment.  (Dkt. No. 45-1).  For ease of reference, the court will refer material contained in "exhibit" by page number beginning with the first page of the exhibit and cite it as "Pl.'s Resp. Ex."

2, 2006, the day before defendant Coupal's shift.  (Pl.'s Dep. at 28; Pl.'s Resp. Ex. 1, at 60).  Plaintiff alleges that, after inmate representatives from the grievance committee came to discuss the grievance with him on October 3, 2006, defendant Coupal confronted plaintiff about the grievance and told plaintiff to take down the pictures.  (Compl. ¶ 1; Pl.'s Dep. at 30).  Plaintiff alleges that defendant Coupal also asked numerous questions plaintiff considered "personal," which plaintiff refused to answer.  (Compl. ¶ 4).

Plaintiff then alleges that defendant Coupal took him to an area between two sets of doors at the entrance to the ASAT dorm, where defendant Coupal was "in [plaintiff's] face intimidating [him] and acting like [Coupal] was gonna assault [plaintiff] with his fists because he put on some thick gloves."  (Compl. ¶ 5).  Plaintiff alleges that after this intimidation, he and Coupal went back to defendant Coupal's desk, where plaintiff again refused to answer questions.  (Compl. ¶ 7).  He also told defendant Coupal that plaintiff "wasn't signing off[6] on my grievance about the pictures."  (Compl. ¶ 7; Pl.'s Dep. at 36).

Plaintiff alleges that defendant Coupal then took him between the two sets of doors again, where defendant Coupal

> kicked my feet from up [sic] under me with his boots.  I fell to the floor
> and balled up to protect myself. [Coupal] then started kicking me and

---

[6] "Signing off" on a grievance is a procedure by which an inmate acknowledges that the problem complained of in the grievance has been informally resolved.

> slinging me around by my shirt and arms into the wall and he stomped on
> my feet with his boots causing my big toenail to fall off.

(Compl. ¶ 8; *see also* Pl.'s Dep. at 38–40).  Plaintiff alleges that defendant Coupal

then told him to go back to his "cube." (Compl. ¶ 9).

Plaintiff wrote a grievance dated October 3, 2006, about the alleged assault.

(Compl. ¶ 11; Pl.'s Resp. Ex. at 48–51; *see also* Pl.'s Dep. at 45–46).[7]  After plaintiff's

Tier III hearing[8] on October 4, 2006—the day after the alleged assault incident with

defendant Coupal—he was sentenced to 30 days in the SHU.  (Def.'s Ex. C; Pl.'s Dep.

at 40).  After serving 30 days in the SHU, plaintiff did not return to the ASAT dorm,

but was released back into the general prison population.  (Pl.'s Dep. at 65–66).

Plaintiff was not checked by medical personnel for injuries related to the

alleged October 3, 2006, assault until December 1, 2006, at which time, no injuries

were noted.  (Compl. ¶¶ 15–16; Pl.'s Dep. at 63–64; Pl.'s Resp. Ex. at 54, 56; Defs.'

Ex. V).  The examination was the result of plaintiff's grievance, complaining of the

assault.  Although the grievance is dated October 3, 2006, it is stamped received by

the Guidance Unit on November 8, 2006, and was given Grievance No. FKN 7373-06

on November 14, 2006. (Pl. Ex. at 48–51).  Superintendent Sears ordered an

investigation of the grievance on November 14, 2006.  (*Id*. at 52).  Sergeant B.

Buchanan conducted the investigation, including ordering plaintiff to be "checked by

---

[7] This grievance was appealed to the superintendent and found to be without merit, as indicated on the report consisting of the last two pages of Defs.' Ex. R.  The report indicates the grievance was filed November 14, 2006, and signed by the superintendent on December 7, 2006.

[8] This hearing was for the "pill cheeking" misbehavior report.

medical," as well as interviewing plaintiff and defendant Coupal.  (*Id*. at 54).
Sergeant Buchanan issued a report on December 1, 2006.[9]  (*Id*.).  Sergeant Buchanan's
report states that plaintiff wished to "'drop the whole thing.'" (*Id*.).

The plaintiff's Ambulatory Health Record for December 1, 2006, states "viewed
for security . . . no injuries claimed or seen."  (Defs.' Ex. V).  However, the Inmate
Injury Report indicates that plaintiff initially stated "nothing happened" and refused to
answer the place or time of injury, but then "alleges that he was injured by an officer -
recanted this 'nothing happened.' Refused to answer any further questions."  (Defs.'
Ex. V).  Plaintiff also signed a paper dated December 1, 2006, which states, "I wish to
withdraw all allegations detailed in [the October 3, 2006 grievance].  I am not being
coerced in any way, shape or form."[10]  (Pl.'s Resp. Ex. at 55).  Plaintiff now alleges he
was threatened by corrections officers to drop the allegations "or they would kick
[plaintiff's] ass and put him in the Box[11] with his other 2 witnesses that he mentioned
in his grievance."  (Compl. ¶ 13; *see also* Pl.'s Dep. at 63–64).

By late December 2006 or early January 2007, plaintiff had been re-admitted to
the ASAT program and was housed in an ASAT dorm where defendant Coupal
worked.  (Compl. ¶ 18; Pl.'s Dep. at 68–69).  Around this same time, an investigator
from the Inspector General's office met with plaintiff.  (Compl. ¶ 20; Pl. Ex. at 57).

---

[9] Defendant Coupal wrote a memorandum to Sergeant Buchanan, dated December 2,
2006, reflecting what he told Sergeant Buchanan during the interview.  (Pl.'s Resp. Ex. at 53).

[10] The court notes that, although plaintiff signed the document, the handwriting appears to
be Sergeant Buchanan's.  *Compare* (Pl.'s Resp. Ex. at 54) *with* (Pl.'s Resp. Ex. at 55).

[11] "Box" is a slang term for the SHU.

Soon thereafter, plaintiff claims that he and defendant Coupal started having conflicts again.  (Compl. ¶¶ 22, 23).

On February 26, 2007, defendant Coupal prepared a misbehavior report for what appeared to be a fresh tattoo on plaintiff's left forearm.  (Defs.' Ex. D).  Plaintiff was examined by medical staff, who poured peroxide on the tattoos.[12]  (Compl. ¶¶ 29–30).  Plaintiff's ambulatory health record dated February 26, 2007, states, "Tattoos on arm, chest-All tatoos[sic] are not bubbling, but one on L wrist, Dice, on arm appears recent." (Defs.' Ex. V).  The Inmate Injury Report dated February 26, 2007, includes the following: "Inmate's Statement: States about 4 months ago - tattoos." (Defs.' Ex. V).  Plaintiff then wrote a grievance dated February 27, 2007, stating that defendant Coupal threatened and harassed him.  (Defs.' Ex. R).[13]

A Tier II hearing was held on March 1, 2007, and plaintiff pled guilty to "tattooing" and an "unhygienic act." (Defs.' Ex. E, F).  Defendant alleges that he pled guilty because the lieutenant "said he was gonna find me guilty so just plead guilty and he would go easy on me and not send me to segregation.  So I did because I didn't want to lose my ASAT program and vocational classes."  (Compl. ¶ 32).

On March 16, 2007, plaintiff alleges he dropped some dishes, and when he went out of his cube to retrieve them, he received a misbehavior report from defendant Coupal for being out of his cubicle and refusing a direct order.  (Compl. ¶ 37; Defs.'

---

[12] Fresh tattoos would cause the peroxide to "bubble."

[13] This grievance was filed on March 1, 2007, and signed by the superintendent on March 12, 2007, finding that plaintiff was "unable to substantiate his allegations," and affirmed by the Central Office Review Committee on April 11, 2007.  (Defs.' Ex. R).

Ex. G).  After a Tier II hearing held on March 19, 2007, and continued on March 24, 2007, plaintiff was found guilty of refusing a direct order, being out of place, and noncompliance with hearing disposition.[14]  (Defs.' Ex. H).  Plaintiff wrote a grievance dated March 20, 2007, stating that defendant Coupal had threatened and harassed him.[15]  (Defs.' Ex. S).  During the investigation of the March 20, 2007 grievance, plaintiff mentioned that he had already accused Coupal of assaulting him, referring to the alleged October 3, 2006 incident.  *Id*.

On March 23, 2007, plaintiff was issued a misbehavior report by defendant Coupal for possessing a set of headphones and an AC adapter, both without plaintiff's inmate number on them.  (Defs.' Ex. J).  Plaintiff alleges these items were actually taken from him about three weeks prior to March 23, 2007.  (Compl. ¶¶ 35, 39–40).  At a Tier II hearing held on March 27, 2007, plaintiff was found guilty of possessing an altered item, unauthorized exchange, and contraband.  (Defs.' Ex. K).  He was then sentenced to 30 days in the SHU.  *Id*.

On April 1, 2007, plaintiff was issued a misbehavior report by defendant Gates as a result of a continuing investigation into a fire set in another inmate's cube on

---

[14] Plaintiff was on "non-program hours," meaning he was restricted to his cubicle when he was not participating in prison programming.

[15] This grievance was filed on March 22, 2007, and signed by the superintendent on April 13, 2007, with the following findings:  "The Grievant has not provided any evidence to support any of his allegations.  It appears the Grievant is using the [Inmate Grievance Program] to retaliate against the officer for him writing misbehavior reports."  (Defs.' Ex. S).  These findings were affirmed by the Central Office Review Committee, which mentioned in its report that the Inspector General's investigation of the October 3, 2006, assault incident found the allegations to be unsubstantiated.  *Id*.

March 1, 2007, and the discovery of homemade alcohol ("hooch") in another inmate's cube on March 22, 2007.  (Defs.' Ex. M; Compl. ¶¶ 42–47).  Defendant Gates conducted the investigation and prepared a report for defendant Phelix, his superior officer.  (Defs.' Ex. P; Gates Decl. ¶¶ 3, 8; Phelix Decl. ¶ 13).  The material in the report is practically identical to that written in the misbehavior report issued to the plaintiff.  (Defs.' Ex. M, P; Phelix Decl. ¶ 14).  Defendant Phelix conducted the Tier III hearing on April 5, 10, and 16, 2007, where plaintiff was found guilty of making "alcohol or intoxicant" and not guilty of "arson, flammable materials and property damage or loss."  (Defs.' Ex. N).

On appeal, the ruling was reversed and expunged because defendant Phelix should have recused himself due to his receipt of defendant Gates' report in Phelix's capacity as Gates' supervisor.  (Phelix Decl. ¶ 13).  In April 2007, plaintiff had a Time Allowance Committee (TAC) review at Franklin, which recommended that plaintiff not lose any good time.  (Compl. ¶ 64; Defs.' Ex. U).  On June 29, 2007, the TAC at Clinton met and recommended plaintiff lose all his good time credit.  (Compl. ¶¶ 65–66; *see also* Defs.' Ex. U).

## II.   **Summary Judgment**

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact.  FED. R. CIV. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations omitted).  "All reasonable inferences and any ambiguities are drawn in favor of the nonmoving party."  *Id*.  However, when the moving party has met its burden, the nonmoving party must do

more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-movant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the non-movant's claims or (2) identifying those portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006) (citing *Celotex Corp.*, 477 U.S. at 23). The second method requires identifying evidentiary insufficiency, not merely denying the opponent's pleadings. *Id.*

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.* A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Additionally, while a court

10

"is not required to consider what the parties fail to point out," the court "may in its discretion opt to conduct an assiduous review of the record" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations and internal quotation marks omitted).

## III.   <u>Retaliation</u>

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (citing *Gayle v. Gonyea*, 313 F.3d 677 (2d Cir. 2002); *see also Hendricks v. Coughlin*, 114 F.3d 390 (2d Cir. 1997)).  Third, the plaintiff must establish a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002)).

The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003), *superseded by* 2003 U.S. App. LEXIS 13030 (2d Cir. Feb. 10, 2003)) (omission in the original).  This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

11

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations. *Bennett*, 343 F.3d at 137 (citing *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002)). Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id*.

### A.    Defendant Phelix

Defendant Phelix argues that there is no causal connection between his actions and plaintiff's grievances, because his "only involvement with the plaintiff relevant to the complaint was when I served as the hearing officer in connection with a disciplinary charge against the plaintiff." (Phelix Decl. ¶ 3). Phelix further argues that "there is no evidence that [defendant] Phelix knew of the grievances or complaints made by the plaintiff." (Defs.' Mem. of Law in Supp. of Defs.' Mot. for Summ. J. at 3). These statements are not supported by the documentation included with defendants' motion for summary judgment.

Defendants submitted an "Interdepartmental Communication," associated with plaintiff's grievance filed on March 1, 2007, indicating that defendant Phelix was involved with the review of that grievance. (Defs.' Ex. R). Defendants also filed

12

another "Interdepartmental Communication" dated April 5, 2007, indicating that defendant Phelix was also involved with the review of plaintiff's grievance filed on March 22, 2007. (Defs.' Ex. S). Another "Interdepartmental Communication," dated March 23, 2007, was filed by the defendants, but the document only indicates that it is connected with the plaintiff, not a specific grievance. (*Id*.). This document is not initialed by defendant Phelix, although the heading indicates the document is from him. (*Id*.).

Plaintiff, while pointing out the temporal proximity between the grievances he filed in March and the Tier III hearing held in April, simply concludes that defendant Phelix "was out to get me out of the facility and to a SHU as retaliatory treatment for all the grievances and letters I wrote . . . ." (Compl. ¶ 56). Even though defendant Phelix incorrectly asserts that he had no involvement with plaintiff, other than presiding over the Tier III hearing held in April, it is clear that any actions taken by defendant Phelix would have been taken regardless of plaintiff's grievances and letters.

Defendant Phelix's role in investigating plaintiff's grievances appears to have been merely supervisory, and not determinative, since many other prison officials were also involved in plaintiff's grievances, and the initial findings were eventually reviewed and upheld by Central Office Review Committee ("CORC"). *See* notes 7 &

9, *supra*.  As to the findings made in the Tier III hearing in April, defendant Phelix found plaintiff guilty of only one out of four offenses, that of making alcohol.[16] (Defs.' Ex. N; Phelix Decl. ¶ 9).  In making his finding, defendant Phelix relied on the testimony of another inmate, Timothy Parry, who specifically testified that plaintiff made the "hooch."[17]  (Defs.' Ex. O).  Because defendant Phelix likely would have found plaintiff guilty even in the absence of plaintiff's grievances, this court recommends that plaintiff's cause of action based on retaliation as to defendant Phelix be dismissed.

### B.    Defendant Coupal

The misbehavior reports prepared by defendant Coupal are also based on plaintiff's actions violating prison rules.  Defendant Coupal prepared a misbehavior report dated February 26, 2007, because plaintiff appeared to have a fresh tattoo. (Defs.' Ex. D).  Defendant Coupal's suspicion was confirmed, as indicated on the Ambulatory Health Record dated February 26, 2007, which states that medical staff

---

[16] It is also questionable that defendant Phelix subjected plaintiff to any "adverse action." He was assigned to preside over plaintiff's hearing; thus, the only thing he did that was arguably adverse to plaintiff was to find him guilty of one of the charges.  As stated above, "adverse action" is that which would deter an individual of ordinary firmness from asserting his rights. Clearly, finding someone guilty of only one of four charges undermines the inference that defendant Phelix was being unfair to plaintiff.  There is nothing in defendant Phelix's actions that would deter an inmate from asserting his rights.

[17] As defendant Phelix stated at the disciplinary hearing, plaintiff's improper misbehavior was exacerbated by the fact that he was being housed in an ASAT dormitory in a program targeting Alcohol and Substance Abuse. (Defs. Ex. O at 56).

examined the tattoo and concluded it was "recent." (Defs.' Ex. V). Defendant Coupal prepared the misbehavior report dated March 16, 2007, because plaintiff was on cube restriction and did not remain in his cube, which plaintiff admits. (Defs.' Ex. H; Compl. ¶ 37). Defendant Coupal prepared the misbehavior report on March 23, 2007, because plaintiff possessed unauthorized altered headphones, which are considered contraband at Franklin, which plaintiff also admits.[18] (Defs.' Ex. J; *see also* Compl. ¶¶ 35, 40). Thus, plaintiff would have been found guilty of the misbehavior reports filed by defendant Coupal, and any First Amendment retaliation claims against defendant Coupal regarding the misbehavior report may be dismissed. *See, e.g., Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir.1994) (holding that the defendants met their burden to show they would have filed disciplinary charges absent any retaliatory motive when "it was undisputed that [the plaintiff] had in fact committed the prohibited conduct"); *Chavis v. Kienert*, 9:03-CV-39 (FJS/RFT), 2005 U.S. Dist. LEXIS 41920, at *53–59, 2005 WL 2452150, at *17–19 (N.D.N.Y. Sept. 30, 2005).

Plaintiff does claim that defendant Coupal's alleged assault was "in retaliation" for plaintiff's grievance regarding the pictures hanging in his cube. Plaintiff includes

---

[18] The court notes that plaintiff tries to explain these incidents by accusing defendant Coupal of conducting searches to harass plaintiff, but the facts that plaintiff had a recent tattoo, was out of place, and possessed contraband remain the same. Plaintiff's arguments based on the technicalities of when he should or should not be written up are not persuasive. (Compl. ¶¶ 39, 40).

a copy of this grievance, and it is dated October 2, 2006.  (Pl.'s Resp. Ex. at 60–63).

When inferences are resolved against the movant, given the temporal proximity of the

grievance and the alleged assault, there are questions of fact as to whether defendant

Coupal was aware of plaintiff's grievance about the picture policy in his cube and

whether he retaliated against plaintiff by the alleged assault.  Thus, plaintiff's First

Amendment claim regarding defendant Coupal may not be dismissed as related to the

alleged assault.

## IV.   **Excessive Force**

### A.   **Exhaustion of Administrative Remedies**

Defendants first argue that plaintiff has failed to properly exhaust the excessive

force claim as against defendant Coupal.  The PLRA exhaustion requirement applies

to all inmate suits about prison life, whether they involve general circumstances or

particular episodes and regardless of the subject matter of the claim.  *See, e.g., Giano*

*v. Goord*, 380 F.3d 670, 675–76 (2d Cir. 2004).  In *Woodford v. Ngo*, 548 U.S. 81

(2006), the Supreme Court held that the PLRA required "proper" exhaustion as a

prerequisite to filing a section 1983 action in federal court.  *Id*. at 92–93.  "Proper"

exhaustion means that the inmate must complete the administrative review process in

accordance with the applicable procedural rules, including deadlines, as a prerequisite

to bringing suit in federal court.  *See id.* at 89–94.  An inmate must appeal any denial

16

of his grievance to the highest available administrative level. *Martinez v. Williams*, 349 F. Supp. 2d 677, 682 (S.D.N.Y. 2004).

However, the Second Circuit has held that certain exceptions to exhaustion apply.  The proper inquiry is to determine "whether: (1) administrative remedies were in fact available to the prisoner; (2) the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it . . . or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense; and (3) special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements."  *Chavis v. Goord*, 333 Fed. Appx. 641, 643 (2d Cir. 2009) (citing *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004) (internal quotation marks omitted).

The grievance procedure in New York is a three-tiered process.  The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. COMP. CODES R. & REGS., tit. 7 §§ 701.5(a)(1) and (b).  An adverse decision of the IGRC may be appealed to the Superintendent of the Facility.  *Id*. § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the CORC.  *Id*. § 701.5(d).  The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance

and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a)(Inmate's Responsibility).

There is also an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 NYCRR § 701.8. Under this procedure, the inmate may (but is not required to) report the misconduct to the employee's supervisor. *Id*. § 701.8(a). The inmate then files a grievance under the normal procedures outlined above; but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the Superintendent for review. *Id*. § 701.8(b). Under the regulations, the Superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment. If so, the Superintendent shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. *Id*. §§ 701.8(c); 701.8(d)(1)–(d)(3). An appeal of the adverse decision of the Superintendent may be taken to the CORC as in the regular grievance procedure. *Id*. § 701.8(h).

Here, defendants argue that plaintiff did not properly exhaust his claim because he did not appeal his grievance related to the alleged assault on October 3, 2006, to the CORC. (*See* Defs.' Ex. T). The superintendent reviewed the alleged assault

18

grievance on December 7, 2006, and there is no question that plaintiff did not appeal the superintendent's decision to the CORC.  (Defs.' Ex. R).  This is apparently due to the paper signed by plaintiff and dated December 1, 2006, which stated, "I wish to withdraw all allegations detailed in [the alleged assault grievance].  I am not being coerced in any way, shape or form."  (Pl.'s Resp. Ex. at 55).

Plaintiff concedes that he did not appeal the assault grievance to the CORC, but claims that the reason he did not pursue the grievance is because he was threatened by Sgt. Buchanan and others, and because he apparently believed that the Inspector General's investigation would be sufficient.  (Compl. ¶ 13; Pl.'s Resp. Mem. at 4).  When asked during his deposition why he "signed off" on the grievance, plaintiff responded, "Because . . . Albany was already involved in it and [the inspector general] . . . the grievance was already wrote [sic] and put in, and I knew they were investigating, so it really didn't matter, and I was scared, honestly. . . . it's like, the heck with it, you know."  (Pl.'s Dep. at 63; *see also* Compl. ¶ 14).

The comment plaintiff made at his deposition suggests that he was frightened into dropping his grievance and that he thought the Inspector General's investigation would take care of the matter.  If, in fact, plaintiff was threatened into dropping his grievance, the defendants would be estopped from asserting the defense of non-exhaustion.  There are questions of fact remaining regarding these alleged threats.

19

Plaintiff also claims that he "signed off" on the grievance because the Inspector General was already investigating the incident, and therefore it was unnecessary to continue the grievance procedure. (Pl.'s Dep. at 63). Generally, an inmate's attempt to exhaust by simply writing a letter, either to supervisory officials or directly to the Inspector General, will ***not*** suffice to exhaust administrative remedies. *See Grey v. Sparhawk*, No. 99 CIV. 9871, 2000 U.S. Dist. LEXIS 8656, at, *5, 2000 WL 815916 (S.D.N.Y. June 23, 2000) (holding that a complaint filed directly with the Inspector General did not excuse the plaintiff "from adhering to the available administrative procedures").

It has been held that "a grievance through informal channels will satisfy the exhaustion requirement ***if the prisoner thereby obtained a favorable resolution of his grievance***." *Thomas v. Cassleberry*, 315 F. Supp. 2d 301, 304 (W.D.N.Y. 2004) (citations omitted). The exhaustion requirement will be satisfied because the inmate would not have any reason to appeal a favorable resolution. *Andrews v. Cruz*, 04 Civ. 566, 2010 U.S. Dist. LEXIS 28124, *16, 2010 WL 1141182 (S.D.N.Y. March 24, 2010) (citations omitted).

In *Andrews*, the court held that the plaintiff could have believed that he obtained a "favorable resolution" because of the Inspector General's investigation since an investigation by the Inspector General was the only relief available under the

20

regulations governing "harassment" grievances.  *Id*.; *See* N.Y.C.R.R. § 701.8.
However, the plaintiff in *Andrews* followed the "harassment grievance" procedure, and
the Superintendent sent the grievance to the Inspector General for investigation.  This
case presents a different situation, in which it appears that plaintiff wrote directly to the
Inspector General, but his grievance also prompted a DOCS investigation of the
incident.

Plaintiff's claim that he had been threatened by defendants leaves questions of
fact regarding whether he exhausted his administrative remedies, and this court will not
recommend granting summary judgment on this basis.

### B.    Eighth Amendment Standard

The Eighth Amendment prohibits the "'unnecessary and wanton infliction of
pain.'" *Baker v. Willett*, 42 F. Supp. 2d 192, 196 (N.D.N.Y. 1999) (quoting *Estelle v.
Gamble*, 429 U.S. 97, 103 (1976); *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).  When
the use of excessive force is alleged, the court must determine whether the force "was
applied in a good faith effort to maintain or restore discipline or maliciously and
sadistically for the very purpose of causing harm." *Whitely v. Albers*, 475 U.S. 312,
320–21 (1986) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*,
414 U.S. 1033 (1973)).  In order to meet the constitutional standard for excessive force,
the defendants' conduct must be "'inconsistent with the contemporary standards of

decency' and 'repugnant to the conscience of mankind.'" *Whitely*, 475 U.S. at 327.

Minor uses of physical force do not reach the constitutional level as long as the force used is not "repugnant to the conscience of mankind." *Hudson v. McMillian*, 503 U.S. 1, 9–10 (1992).  However, the court must determine the need for the force, the relationship between the need and the amount of force used, the extent of the injury suffered, the extent of the threat to the safety of staff and inmates, and any efforts made to temper the severity of a forceful response.  *Whitely*, 475 U.S. at 321.  Not every push or shove, even if it seems unnecessary, amounts to a violation of the constitution. *Hudson*, 503 U.S. at 9–10 (*de minimis* force); *Johnson v. Glick*, 481 F.2d at 1033.

Here, defendant Coupal argues that he never assaulted plaintiff.  However, resolving inferences against defendant Coupal leaves an issue of fact both as to the nature of the interaction between defendant Coupal and plaintiff on October 3, 2006, and its severity.  While there is no direct proof of violence due to the lack of evidence of physical injury, the alleged inmate witnesses' refusal to testify and length of time between the medical examination and the alleged incident at least raises the possibility of threats and a cover-up.  If the incident occurred as plaintiff alleges, there appears to be little to no provocation for the alleged physical force used by defendant Coupal. Resolving inferences against the movants results in an issue of fact to be determined by a jury.

22

Because issues of fact exist as to plaintiff's retaliation claims as well as plaintiff's excessive force claims against defendant Coupal, defendants' motion for summary judgment as to defendant Coupal fails.  Accordingly, their motion for summary judgment as to plaintiff's cause of action for retaliation as to defendant Coupal should be denied.  In addition, defendants' motion for summary judgment as to plaintiff's cause of action for excessive force as to defendant Coupal should be denied.

## V.   **Due Process**

To establish a claim based on a violation of due process, a plaintiff must first establish a constitutionally protected liberty or property interest that a plaintiff was denied without due process.  *See Perry v. McDonald*, 380 F.3d 159, 173 (2d Cir. 2001) (citations omitted).  Prison discipline implicates a liberty interest when it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin v. Conner,* 515 U.S. 472, 484 (1995).  The Second Circuit has interpreted the Supreme Court's decision in *Sandin* to mean that "a prisoner's restricted confinement within a prison does not give rise to a liberty interest, warranting procedural due process protection, unless the conditions 'impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sealey v. Giltner,* 197 F.3d 578, 583 (2d Cir. 1999) (quoting *Sandin,* 515 U.S. at 484).  Atypicality in a *Sandin* inquiry is normally a question of law.  *Colon v. Howard,* 215

23

F.3d 227, 230–31 (2d Cir. 2000); *Sealey,* 197 F.3d at 585.[19]  When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement.  *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335–36 (2d Cir. 1998); *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997).  *See also Williams v. Goord,* 111 F. Supp. 2d 280, 289 (S.D.N.Y. 2000) (SHU confinement in New York generally does not impose atypical and significant hardship because it remains within the normal range of prison custody).

The duration of a disciplinary confinement, while not the only factor to be considered, remains significant under *Sandin*.  *Colon,* 215 F.3d at 231.[20]  While under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin* (*see id.* at 232 n. 5), the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or

---

[19]  In cases where there is a factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution.  *Colon,* 215 F.3d at 230–31; *Sealey,* 197 F.3d at 585.

[20]  Segregation for a period of thirty days was found by the Supreme Court in *Sandin* not to impose a significant hardship on an inmate.  515 U.S. at 485–86.  In explaining its reasoning, the Court found that the disciplinary confinement failed to present "a dramatic departure from the basic conditions" of an inmate's normal sentence.  *Id.* at 485.

less does not.  *Id.* at 231–32.[21]

In this case, plaintiff alleges that his due process rights were violated by defendants Gates and Phelix based on their involvement in the investigations of the homemade alcohol and dorm fire incidents.  Defendant Gates' involvement was limited to his April 1, 2007, misbehavior report.  Even if the misbehavior report was false, it would not rise to a violation of substantive due process.  *See Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986) (a prison inmate has no constitutionally-guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process).  Additionally, the penalty imposed by defendant Phelix as a result of the Tier III hearing in April included three months in the SHU, with one month suspended and six months deferred.  (Phelix Decl. ¶ 10; Defs.' Ex. N).  This penalty does not implicate a liberty interest protected by the due process clause.  *See Alvarado v. Kerrigan*, 152 F. Supp. 2d 350, 355 (S.D.N.Y. 2001) (101 days or less in the SHU without more, does not trigger a liberty interest).

Because plaintiff has failed to establish a liberty interest, no due process violation occurred.  Therefore, plaintiff's due process claims as to defendants Gates

---

[21] In *Colon*, a Second Circuit panel split markedly on whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. 215 F.3d at 232–34 (Newman, C.J.), 235–37 (Walker, C.J. and Sack, C.J., concurring in part).

and Phelix must fail.  Accordingly, this court recommends that defendants' motion for summary judgment be granted as to plaintiff's cause of action based on a deprivation of due process as to defendants Gates and Phelix.  Plaintiff also appears to allege a violation of due process for the revocation of good time credit.  (Comp. Count 3).  However, plaintiff's claim for damages relating to the loss of good time credits was dismissed on October 4, 2007.  (Dkt. No. 6).

  **WHEREFORE**, based on the findings above, it is

  **RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 37) be **GRANTED IN PART,** and the complaint **DISMISSED IN ITS ENTIRETY AS TO DEFENDANTS PHELIX and GATES**, and it is further

  **RECOMMENDED**, that defendants' summary judgment motion be **DENIED IN PART**, as to plaintiff's claims based on retaliation and excessive force as to defendant Coupal, as discussed above.

  Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: March 31, 2010

Andrew T. Baxter

Hon. Andrew T. Baxter
U.S. Magistrate Judge